## IN THE UNITED STATES COURT FOR
## THE DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

| | |
|---|---|
| **ANNIE BENNETT FITCH,** | |
| | Civil Action No. |
| **PLAINTIFF** | |
| v. | <u>**JURY TRIAL DEMANDED**</u> |
| **THE ST. PAUL'S SCHOOL FOR GIRLS** <br> **d/b/a The St. Paul's Schools for Girls** <br> **Serve Resident Agent** <br> Kate McKew <br> 11232 Falls Road <br> Brooklandville, Md. 21022, | |
| **and** | |
| **Christina Ferrens** <br> 11232 Falls Road <br> Brooklandville, Md. 21022, | |
| **and** | |
| **Ereni Malfa** <br> 11232 Falls Road <br> Brooklandville, Md. 21022, | |
| **and** | |
| **Sabrina Murray** <br> 11232 Falls Road <br> Brooklandville, Md. 21022, | |
| **and** | |
| **Katherine Grace Porter** <br> 428 Range Road <br> Towson, Md. 21204 | |
| **and** | |
| **Sara Porter** | |

| | |
|---|---|
| 428 Range Road<br>Towson, Md. 21204<br><br>**and**<br><br>**Greta Heck**<br>111 Railroad Avenue<br>Glyndon, Md. 21071<br><br>**and**<br><br>**Judy Heck**<br>111 Railroad Avenue<br>Glyndon, Md. 21071<br><br>**and**<br><br>**Bra'el Taylor**<br>4521 Hawksbury Road<br>Pikesville, Md. 21208 | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Anne Bennett Fitch bring this action against the Defendants The St. Paul's Schools, Inc, d/a/a St. Paul's School for Girls ("SPSG"), Christiana Ferrens, Ereni Malfa, Sabrina Murray, Katherine Grace Porter, Sara Porter,  Judy Heck, Greta Heck and Bra'el Taylor.  For her causes of action, Plaintiff alleges as follows:

## II. THE PARTIES

1. Annie Bennett Fitch is an adult resident of the state of Maryland. At all times relevant to this Complaint she was a minor and a "child and a student with a disability."

2. The St. Paul's Schools, Inc. is a Maryland Corporation formed under the laws of Maryland having its principal office located at 11152 Falls Road, Brooklandville, Maryland 21022, being the same corporation previously known as Hillside Coordination, Inc.  The St. Paul's Schools, Inc. owns and operates four different school entities, including the St. Paul's School for Girls

("SPSG"). SPSG is an Episcopal private day school for girls located in Brooklandville, Maryland, which has as its professed mission, *inter alia*, the education of girls in "in an environment of absolute love and support, founded on principles of inclusion and compassion. . . ."

3.   Christina Ferrens is an employee of The St. Paul's Schools and at all times relevant to this action was the Head (principal) of the St. Paul's School for Girls Upper (high) School.

4.   Ereni Malfa is an employee of Defendant The St. Paul's Schools and for the period of this Complaint which covers the allegations of the Complaint set forth at Paragraphs 36- 72, was the Head of the St. Paul's School for Girls.

5.   Sabrina Murray is an employee of Defendant The St. Paul's Schools and for the period this Complaint which covers the allegations of the Complaint set forth at Paragraphs 36-72 was the Dean of Students at the St. Paul's School for Girls.

6.   Katherine ("Kate") Grace Porter ("Porter") is an adult resident of the state of Maryland and was a student at the St. Paul's School for Girls until her graduation on June 11, 2021. Porter turned 18 years of age on November 28, 2020.  Porter attended SPSG as the daughter of an employee, receiving a deeply discounted, tax-free tuition benefit, and Porter's parents paid a small fraction of the full tuition cost paid by the Plaintiff Parents.

7.   Sara Porter is an adult resident of the state of Maryland, the adoptive mother of Katherine Grace Porter, and a teacher in the employ of the Defendant,

8.   Greta Heck ("Heck") is an adult resident of the state of Maryland and was a student at St. Paul's School for Girls through her graduation on June 11, 2021. Heck turned 18 years of age on March 11, 2021.

9.   Bra'el Taylor ("Taylor") is an adult resident of the state of Maryland and was a student at St. Paul's School for Girls through her graduation on June 11, 2021. Taylor turned 18 years of age on February 21, 2021.

### III.   JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 18 U.S.C. § 1331 because this Complaint arises under federal statutes including the American With Disabilities Act and Section 504 of the Rehabilitation Act. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

### IV.   FACTUAL BACKGROUND

**A.  Facts Relating To The Defendants' Legal and Statutory Obligations To Plaintiff.**

11. On or about August 29, 2017, Plaintiff matriculated at SPSG as a member of the high school freshman class with an expected graduation date of June 2021.

12. Shortly after Plaintiff began classes at SPSG, Plaintiff provided the school with a copy of an evaluation performed by an educational expert, which disclosed that Plaintiff had a learning disability and also suffered from an anxiety disorder.

13. In or around September 2017, the Plaintiff entered into an Individualized Education Program ("IEP") agreement with SPSG which addressed accommodations for Plaintiff's learning disability and anxiety disorder.

14. At all times relevant, the Defendant School and its employees were aware of  Plaintiff's disability and the existence of her IEP.

15. SPSG's promotional material, SPSG's enrollment contract and the SPSG Student-Parent Handbook which is incorporated into the enrollment contract by reference represents that it "is committed to creating a supportive learning environment where all individuals are valued for their unique contributions and able to achieve their higher potential."

16. SPSG's promotional material, the enrollment contract which incorporates the Student-Parent Handbook by reference promises that the school "rejects all prejudices, particularly those

based on race, national and ethnic origin, religion, socioeconomic status, gender identity, sexual orientation and physical characteristics."

17. The SPSG Student-Parent Handbook states that one of the school's essential rules is that "physical or emotional injury to others . . . *will not be tolerated.*" (emphasis added).

18. Further the school represents in its Handbook that it "is committed to providing an atmosphere free of harassment or intimidation" and that "every individual in the SPSG community is to be treated with sensitivity and respect and is entitled to work and learn without fear of intimidation, humiliation and/or degradation from unwanted and unacceptable behavior, including but not limited to, comments, images and technology."

19. The SPSG Student-Parent Handbook prohibits students from "engaging in any form of bullying, harassment, or intimidation."

20. SPSG requires all students, and their parents, to sign an Acceptable Use Policy agreement ("AUP") at the beginning of each year.

21. That contract was signed by Defendants Katherine Porter, Sara Porter, Greta Heck, Judy Heck and Bra'el Taylor each year they were enrolled in SPSG's Upper School including the 2019-2021 academic year at issue in this Complaint.

22. The Student Defendants did not at any time take steps to disaffirm the AUP contract within a reasonable period of time after they turned 18.

23. The AUP requires that: "on and off campus online behavior used to harass any individual including but not limited to bullying, intimidation and discrimination should be reported immediately to a faculty member, and will lead to disciplinary action and possible criminal prosecution under Maryland House Bill 396-Misuse of Interactive Computer Service of "Grace's Law'"

24. Under the AUP students "are expected to report all violations of this AUP to an SPSG faculty or staff member."

25. Under the AUP students are prohibited from using electronic media for "bullying, derogatory, [and] harassing" others and that they must "act[ing] in accordance with all Maryland and United States laws at all times.

26. Under the AUP if students violate the AUP they "will" be subject to discipline up to and including expulsion."

27. The AUP prohibits students "in accordance with Maryland's Misuse of Interactive Computer Service," from using "interactive computer service" to maliciously engaged [sic] in a course of conduct that inflicts serious emotional distress to a minor or places a minor in reasonable fear of death or serious bodily injury . . ."

28. A violation of Maryland's Misuse of Interactive Computer Services law is a misdemeanor, punishable by imprisonment and a fine.

29. By signing the AUP, students and their parents represent that they agree to comply with SPSG's policies with respect to online behavior, and that this agreement is for the benefit of everyone in the school community, including the Plaintiff.

30. The Plaintiff was also a signatory to that contract, and at all times complied with her obligations under the AUP.

31. The St. Paul's School Faculty Handbook sets forth Standards of Conduct for faculty and administrators  requiring "[e]mployees who learn or suspect that a student is being harassed, bullied or hazed should . . report such information to the Heads of School or an administrator *as soon as possible."*

32. Defendant Sara Porter agreed to these Standards her role as faculty at the St. Paul's Lower School.

33.   The Faculty Handbook defines "bullying" to include "cyberbullying" which it further defines as "sending or posting of harmful and/or cruel text or images via the internet, cell phones, chat rooms, email, instant message, or any other digital communication devices."

34. Section 504 of the Rehabilitation Act and Title III of the American With Disabilities Act prohibit discrimination on the basis of disability by any entity receiving federal funds.

35.  For the period from on or about April 4, 2020 to on or about September, 2021, part of the time period covered by this Complaint, the Defendant The St. Paul's School was the recipient of a $4.67 million Paycheck Protection Program loan from the Small Business Administration which required the School to comply with federal civil rights laws, including but not limited to Section 504 of the Rehabilitation Act.

36. According to the Department of Education bullying and harassment are civil rights issues when directed at students with disabilities.

37. The Department of Education defines bullying as involving "overt physical behavior or verbal, emotional or social behaviors (e.g., excluding someone from social activities, making threats, withdrawing attention, destroying someone's reputation) and can range from blatant aggression to far more subtle and covert behaviors."

38. That Letter makes clear that "although the focus of th[e] letter is peer-to-peer bullying it is important to acknowledge that *it is also intolerable for teachers and school staff to be party to school bullying and disability harassment . . . .*"

39. As alleged below, Defendant Sara Porter, a teacher at the school, became an active participant in the harassment of Plaintiff in contravention of her legal obligations to Plaintiff as did other teachers and administrators at the school, including but not limited to: Ereni Malfa, the Head of SPSG, Christy Ferrens, the Head of the SPSG Upper School, and Sabrina Murray, the Dean of Students.

7

40. All of these SPSG personnel failed to implement the policies designed to protect students from the physical and/or emotional injury caused by bullying, harassment, or intimidation.

41. Experts also agree that children with psychological issues, such as anxiety disorders or learning disabilities, are often the targets of bullying, and that children who bully deliberately select such children as targets because they will be more sensitive to verbal assaults and more likely to be unable to effectively respond to taunts.

42. The Defendant School was at all times relevant aware that Plaintiff suffered from disabilities that made her more vulnerable to emotional injury caused by bullying and harassment and SPSG failed to put in place adequate – or even any – measures to prevent the bullying or mitigate its effects.

43. The SPSG Enrollment Contract which Sara and Brett Porter, Judy and Kent Heck and Mary Burrell (the mother of Bra'el Taylor) signed on behalf of their daughter contains a provision which permits the School "to require the withdrawal of any student if it determines withdrawal to be in the best interests of the Student or the School. Reasons may include but are not limited to . . .behavior by the parent, guardian or Student that is detrimental or disruptive to the School."

B. **Facts Relating To Defendant SPSG's Failure To Accommodate, Discrimination And Retaliation Against Plaintiff Under the ADA and Rehabilitation Act.**

54. Throughout Plaintiff's tenure at SPSG, Ferrens, the head of the SPSG Upper (high) School mocked Plaintiff's learning disability and her parents' efforts to ensure that Plaintiff's IEP was followed, telling Plaintiff's mother, Ms. Bennett, when she requested enforcement of Plaintiff's IEP with respect to a specific test in Spanish that Bennett "was just upset because Plaintiff did not receive an A" on the test.

55. Ferrens also made clear to the teachers at the school, including Whitney Schultz, Plaintiff's English teacher that they were free to ignore Plaintiff's IEP and Ms. Bennett's requests

for accommodations for her daughter's disability to allow her to participate in advanced courses at SPSG.

56. On February 15, 2020, after Ms. Bennett requested accommodations for Plaintiff's disability that would have made it possible to participate in A.P. English courses, including AP Literature from Ms. Schultz, Plaintiff's English teacher, in February 2020 and provided her with guidance from the United States Department of Education on that subject which encouraged schools to accommodate students with disabilities in AP classes, Ms. Ferrens told Ms. Schultz to ignore Ms. Bennett's request for an accommodation.

57. Ms. Ferrens told Ms. Schultz on February 15, 2020 that Ms. Bennett was "crazy" and that she made "a federal case out of everything."

58. Ms. Ferrens also opined in another email to Ms. Schultz sent in February 2020 that the Fitch family gave SPSG donations only so that the School would "give into their demands" – the "demands" apparently being that the School provide legally required accommodations for Plaintiff's disability.

59. In April or Mary 2020 Ferrens told Sabrina Murray to send an email to Ms. Bennett that would discourage Plaintiff's parents from making future complaints, telling Ms. Murray that she did not want "this behavior to continue."

60. Upon information and belief "this behavior" was Ms. Bennett's complaints about the bullying of her daughter and her requests for accommodations.

61. The Plaintiff did not learn about the existence of emails from Ferrens, the head of St. Paul's School for Girls Upper School that a teacher could ignore her parents' request for an accommodation for her disability until those emails were produced in the state court litigation brought by her parents on March 15, 2023.

62. The Plaintiff was an otherwise qualified person with respect to the AP program at SPSG, who despite her learning disability maintained an overall high GPA in all courses, and a very high GPA in English courses.

63. Beginning in freshman year, Plaintiff became friends with the Defendant Students, Kate Porter and Greta Heck, along with Niya Robinson and Br'ael Taylor through Defendant Heck.

64. In the fall of 2019 when Plaintiff had a minor disagreement with Kate Porter, who was the acknowledged "leader" of this group of friends, with the power to decide who was "in" the group, and who was "out," Porter began to harass and bully Plaintiff and pressured Heck, Robinson and Taylor to do the same thing.

65. Beginning in the fall of 2019, Defendant Porter and the other Defendant Students began to attack Plaintiff engaging in all the hallmark behavior of relational aggression/bullying, including ignoring behaviors, malicious teasing and putdowns, social exclusion and manipulating friendships.

66. The Defendant Students, at Porter's behest, began to bully Plaintiff on a daily basis. By way of example and without being exhaustive because of the extent, constancy and duration of the bullying: the Defendant students mocked Plaintiff or being clumsy and uncoordinated, mimicked her gestures and gait, attacked her weight and what she ate, frequently shouted at her in public to "shut up," mocked her laugh and the way she ate, made fun of her for talking "too loudly," made fun of her for being "too sensitive," and mocked her for participating in school clubs and programs and her desire to achieve good grades and gain admission to a competitive college.

67. Defendant Taylor was particularly active in mocking Plaintiff's physical characteristics, imitating her laugh and her walk.

68. The Student Defendants as a group, systematically identified areas that made Plaintiff self-conscious and taunted her about them, sometimes to the point of tears and then made fun of Plaintiff's when she became upset because of the bullying, telling her she was "too sensitive," comments designed to cause, and causing emotional injury to Plaintiff.

69. The bullying was based upon physical characteristics of Plaintiff which resulted from her disabilities.

70. The Defendant Students frequently made use of ignoring behaviors to make Plaintiff feel excluded from the group, including failing to respond to remarks addressed to her by Plaintiff refusing to walk beside her in the hall, walking past her in the hallway without greeting her, and the other Defendant Students engaged in the same behavior, acting as if Plaintiff was not present.

71. As noted, after the August disagreement between Plaintiff and Porter the Defendant Students, at  Porter's behest, deliberately excluded Plaintiff from social activities of the group.

72. Porter worked behind the scenes to destroy Plaintiff's relationships with her other friends, whom Porter controlled.

73. On January 27, 2020, Plaintiff's mother, Ms. Bennett met with SPSG to discuss the bullying and harassment of her daughter and to find out what the school could do to ameliorate the situation.

74. Christy Ferrens, head of the SPSG Upper School and Sabrina Murray, the Dean of Students whom Plaintiff was told was responsible for investigating bullying complaints and imposing discipline or deciding on mitigating solutions to bullying were present at that meeting

75. At this meeting and in multiple, written communications to the school throughout this time period, Ms. Bennett described in detail the injurious conduct that had occurred over the past months, including the bullying based upon Plaintiff's disability.

76. At the January 2020 meeting, Ferrens responded to those concerns by smiling, saying that this kind of conduct "happens all the time" when one girl does something that the other girls think "breaks friendship rules," and that this girl is always ostracized, acknowledging that bullying occurred.

77. When Ms. Bennett expressed reluctance to file a formal complaint on her daughter's behalf, Ferrens agreed that it would be difficult for Plaintiff because "if the other girls find out they may come up to Plaintiff and call her a bitch for complaining."

78. Ferrens – the head of SPSG, which according to its own contractual and promotional material was devoted to the nurture of female students and promised to protect them from physical and emotional harm – painted a chilling picture to Ms. Bennett of the actual social and educational environment at SPSG which included widespread use of relational aggression and bullying, including girls ostracizing other girls for breaking trivial and imaginary "friendship rules" and calling each other "bitches" for asserting their right to complain about harassment, in stark contrast to the "supportive sisterhood" SPSG touts on its website.

79. Ferrens and Murray did not offer any solutions to the problem, nor did they offer to put in place any protections for Plaintiff  in fact, they seemed to view the meeting as simply an opportunity for Ms. Bennett to "vent."

80. Plaintiffs' parents met with SPSG again on February 21, 2020 to discuss the bullying of their daughter based upon her physical characteristics and to seek accommodations to protect her from bullying based upon her physical characteristics.

81. That meeting took place six days after Ferrens had told Ms. Schultz to ignore the Plaintiff's mother's request for an accommodation for her daughter's disability.

82. Ferrens' refusal to take action to protect Plaintiff from bullying following immediately after the Plaintiffs asked for an accommodation for their daughter, shows discriminatory intent and intent to retaliate.

C. **Facts Relating To Breach Of The AUP Contract.**

83. During the time period when the Student Defendants were engaged in a campaign to bully Plaintiff, i.e. from September 2019 to June 2021, the Defendants sent text messages in a group chat during school hours and on school property, sometimes sent among the Student Defendants and read in the presence of the Plaintiff, referring to Plaintiff as "an ugly ass hoe[1]," and an "Ass Hat[2]" Plaintiff's "friends" were sending texts to each other, again, during school hours and in her presence saying "Bitch shut the fuck up" and "nobody likes u," "we don't like u stop talking," "I want her to dissolve," "Fuck U Annie" and saying in response to Plaintiff receiving the gift of a new car from her parents that "when I get my license there will be an anonymous hit and run . . . and maybe eggs and slashed tires" to which one of the girls responded "Hahahaha."

84. The text messages confirm that the girls would at times, completely ignore Plaintiff when she was in their presence.

85. Even after the girls banished Plaintiff from their friend group they continued to exchange angry text messages saying it was "disgusting" that Plaintiff had been selected to go to the Student Government Leadership Institute," and when Plaintiff gave her senior speech – <u>eight full months later</u> – Kate Porter texted about how "funny" the speech was.

86. On January 16, 2020 Porter sent Plaintiff a message ending their friendship, Porter, Taylor and Robinson all posted "F*** Fake Friends" images on their VSCO account directed at Plaintiff.

---

[1]   Whore.
[2]   "Ass Hat" is defined by the Oxford Dictionary as "a stupid or contemptible person."

87. From on or about January 17, 2020 to March 2020, Fitch's mother, Jamie Bennett informed  Defendant Sara Porter  in a series of emails, letters and text messages that Porter had bullied and ostracized Plaintiff

88. Although Sara Porter initially apologized to the Plaintiff Parents for Porter's bullying and agreed to have Porter apologize as well, self-report her bullying to the School, and receive counseling, she later reneged on those promises and upon information and belief, did not seek counseling for her daughter, and did not require Porter to apologize.

89. Sara Porter refused to have Porter take down the "F*** Fake Friends" sign that Porter had posted despite knowing that her daughter had acted to injure Plaintiff and engaged in bullying in contravention of SPSG's published anti-bullying policy,

90. Sara Porter has acknowledged, in a deposition taken in a case brought in state by Plaintiff's parents that she had the text messages quoted above in her possession in January or February 2020.

91. Sara Porter never disclosed these text messages, including the threats to slash Plaintiff's tires and have "an accidental hit and run" to the School Administrators or to law enforcement, although these texts violate the AUP of the School and Grace's Law, the Maryland law prohibiting cyberbullying.

92. Further, Sara Porter did not tell the Plaintiff's parents about these messages, so they could take steps to protect their daughter.

93. The Plaintiff did not learn about the existence of these text messages until they were produced in the state court litigation brought by her parents on April 21, 2023.

94. Emails disclosed in discovery in the Plaintiff's parents state court litigation show that Sara Porter reneged on her promise to have her daughter self-report her bullying shortly after a

conversation with Defendant Christy Ferrens who, upon information and belief, discouraged her from reporting her daughter's cyberbullying to the school.

95. On March 2, 2020, Sara Porter emailed Ferrens saying that "I reached out to Jamie Bennett to let her know that Kate would be writing [the Plaintiffs' daughter] an apology letter and that she will be coming to the school to discuss her role in the allegations."

96. Mrs. Porter again contacted the School on March 11, 2020  saying that she had apologized to the Plaintiff's parents and that Kate would be coming to the School to "discuss her role in the allegations made this week."

97. After these emails Sara Porter called her colleague, Christi Ferrens, the Head of the SPSG Upper School, to find out "what would happen if Kate was to admit to the school that she had bullied Annie."

98. Ferrens responded by informing Mrs. Porter that the School "would follow our standard procedures as outlined in our bullying and harassment policy that appears in our Upper School handbook." *Id.*

99. Ferrens' email reveals that "Sarah [sic] also expressed concern about how Kate sharing evidence [of bullying] would implicate other girls as well." *Id.*

100.     On February 28, 2020, Ferrens, Sabrina Murray, the Dean of Students of the Upper School, and Laurie Mays, the School counselor, met with Mrs. Porter  "who wanted to be informed about next steps if Kate turned herself in."

101.     Despite evidence that Kate Porter not only had plans to self-report her bullying and "turn herself in" but that she also had evidence that could "implicate other girls *as well*," no one at the School ever asked Sara Porter what that evidence was or how other girls were implicated in the bullying despite the fact that Porter, as a St. Paul's School employee, was obligated to tell the School anything she knew about bullying.

102.     Upon information and belief, when Sara Porter and SPSG realized that if Sara Porter reported her daughter's text messages about Plaintiff to SPSG, the School would have to report her to authorities for violating Grace's Law.

103.     Alternative, upon information and belief, Porter and SPSG were concerned that if Plaintiff's parents learned about the derogatory text messages, they would report the students to the authorities for violating Grace's Law.

104.     Upon information and belief Ferrens, or some other administrator at SPSG told Sara Porter not to disclose the derogatory text messages.

105.     SPSG told at least one of the parents of an alleged bully that the Plaintiff's allegations that she had been bullied were false.

106.     On September 1, 2020 Kelley Robinson, the mother of one of the perpetrators, Niya Robinson emailed Ereni Malfa, Sabrina Murray and Christi Ferrens, asking the School to confirm as "you stated in conversation [that] you agree the claims are false as well," and to provide a letter confirming that fact.

107.     Malfa, the Head of SPSG, responded to Mrs. Robinson's email the same day not by denying that the School told the Robinsons the allegations were false, but by saying that "I think it is important that we touch base today."

108.     Malfa provided the Robinson's with her cell phone number and arranged to talk to her in person, to, upon information and belief, provide the assurances Robinson sought orally and to tell Robinson not to put anything else in writing that would memorialize SPSG's defamatory statements.

109.     On or about May 7, 2020 the school responded to the Plaintiff's parents saying that the course of harassment and bullying that Plaintiff had endured for months was simply the product of "social dynamics," and making it clear that the school would take no action and in fact,

tolerated the deliberate physical and emotional injury of one of its students despite the school's promoted "no tolerance" policy.

110.     The Defendant School made this determination without conducting any meaningful investigation, despite Ferrens' previous acknowledgment that what had happened to Plaintiff was a classic example of relational aggression, and after reviewing text messages that proved that Plaintiff A.B. had been deliberately ostracized from the group and that she had been cyberbullied.

111.     In its May 7, 2020 email informing the Plaintiff's parents of the outcome of the School's investigation SPSG falsely represented that it had gone through the disciplinary process with the accused students when it is clear that the offending students were never interviewed about the allegations as required by the Schools disciplinary procedures or asked to produce text messages or posts about the Plaintiff.

112.     Ms. Murray has since admitted in a deposition taken in this case that although the School did not dispute that the conduct described by the Plaintiff had occurred, SPSG did not agree that it constituted bullying.

113.     Ms. Murray conceded that the conduct described would cause emotional injury to Plaintiff .

114.     In fact, the school made crystal clear to the Plaintiff that instead of following the standards espoused in its promotional material and Student-Parent Handbook and the AUP agreement that physical and emotional injury would not be tolerated, the school actually subscribed to the belief that students at SPSG had the absolute right to bully and ostracize other students.

115.     When Ms. Bennett addressed her concerns with the school's attorney Geoff Genthe in a telephone call that took place on May 7, 2020, he contended– despite the wealth of academic and popular literature, not to mention state and federal law to the contrary—that what happened to Plaintiff was a result of "social dynamics" and was not bullying and admitted that "the school *was unable to police* social vagaries" such as the harassment Plaintiff endured, providing further confirmation that the school's advertised commitment to protect students from emotional injury is knowingly false and misleading.

116.     Genthe, who was audibly upset and defensive during the telephone call, told Ms. Bennett that she was interfering with the "healing" *of the bullies who had harassed and injured Plaintiff for months,* presumably because Ms. Bennett had the audacity to complain about bullying to the school.

117.     This was a direct threat against Plaintiff who could potentially herself be disciplined or expelled for "interfering with the bullies' healing" under the Plaintiff's parents contract with the school.

118.     Plaintiff missed more than twenty days of school as a result of bullying, after having previously had an almost perfect attendance record in middle school, as she did not feel safe and was unable to face her harassers. She struggled to maintain her GPA, and to continue to participate in leadership opportunities that were important to her future.

119.     Plaintiff suffered intense anxiety from the bullying episodes and the discrimination described above, including suicidal ideation, which interfered with her ability to absorb information, focus on and produce her best work at school during a critical time for her college applications; she was socially isolated and deeply distressed; she found it nearly impossible to make new friends at clique ridden SPSG because of the rumors spread by the Defendant Students

that she was "damaged goods" and because the Defendant Students continued to interfere with her new relationships and with her participation in school events such as prom and the school failed to take adequate steps to prevent or mitigate those consequences.

120.     The Plaintiff suffered financial and emotional damage from the bullying which have affected and her opportunities for further education and her future earnings have been severely limited because of the Defendants' actions

121.     The Defendants acted with actual malice, that is, with a specific intent to harm the Plaintiff and to cause her damage.

## COUNT I
### Discrimination under the Americans With Disability Act
### (Against the Defendant, The St. Paul's School)

122.     The allegations set forth in Paragraphs 1-121 are incorporated herein by reference.

123.     At the time of the aforementioned conduct, the Defendant The St. Paul's School knew that the Plaintiff was a student with a disability as defined by federal law and also knew that she was otherwise qualified for the AP Literature and other similar courses she sought to take in her senior year at SPSG.

124.     Defendant excluded Plaintiff from programs in which she was otherwise entitled to participate and refused to accommodate her by reason of her disability.

125.     As a result of the Defendants' actions Plaintiff is entitled to monetary damages, the costs for this action, attorney's fees and seeks all other legally available relief.

## COUNT II
### Retaliation under the American With Disabilities Act and Section 504 Of The Rehabilitation Act
### (Against the Defendant, The St. Paul's School)

126.     The allegations set forth in Paragraphs 1-121 are incorporated herein by reference.

127.     At the time of the aforementioned conduct, the Defendant The St. Paul's School knew that the Plaintiffs' daughter was a student with a disability as defined by federal law.

128.     The Defendant also knew that Ms. Bennett was advocating on behalf of her daughter so that she would be receive accommodations for her disability that could enable her to take additional AP courses and help her attain admission at a good college and to protect her from bullying based upon her disability.

129.     Because Ms. Bennett advocated for her daughter, SPSG employees, including but not limited to Christina Ferrens, the head of SPSG, decided to retaliate against Plaintiff by refusing to investigate well-founded allegations of bullying, refusing to require an employee of The St. Paul's School to disclose what she knew about bullying and cyberbullying, and refusing to take necessary steps to protect Plaintiff from bullying which exacerbated Plaintiff's disability and interfered with her ability to learn and participate in school sponsored activities relevant to her educational goals.

130.     Having the aforesaid knowledge that Ms. Bennett was advocating for her daughter to be accommodated for her disability and protected from bullying based in part on her disability and which exacerbated her disability interfering with her ability to learn and to participate in school sponsored activities, the Defendant retaliated against and interfered with Plaintiff on account of her having lodged, through her parents, requests for accommodations a right granted or protected by the aforementioned Act. 42 U.S.C. §12203(b) and Section 504 of the Rehabilitation Act. These actions were reasonably calculated to interfere with the exercise or enjoyment of ADA rights and rights under Section 504 of the Rehabilitation Act made with intent to discriminate.

131.     As a result of the  Defendants' interference with Plaintiff's exercise of her rights under the ADA and Section 504 of the Rehabilitation Act the Plaintiff is entitled to the costs for this action, attorney's fees and seeks all other relief to which Plaintiffs may be legally entitled.

## COUNT III
### Discrimination under Section 504 of the Rehabilitation Act
### (Against the Defendant, The St. Paul's School)

132.     The allegations set forth in Paragraphs 1-111 are incorporated herein by reference.

133.     At the time of the aforementioned conduct, the Defendant The St. Paul's School knew that the Plaintiff was a student with a disability as defined by federal law and also knew that she was otherwise qualified for the AP Literature and other similar courses she sought to take in her senior year at SPSG and that the bullying she experienced limited her ability to participate in programs offered by the school.

134.     At the time of the aforementioned conduct, the Defendant SPSG was a recipient of federal funds.

135.     Defendant excluded Plaintiff from programs in which she was otherwise entitled to participate solely by reason of her disability.

136.     As a result of the Defendants' actions Plaintiff is entitled to monetary and or compensatory damages, the costs for this action, attorney's fees and seeks all other legally available relief.

## COUNT III
### (Breach of Contract – Acceptable Use Policy)
### (Against all Defendants)

137.     The allegations set forth in Paragraphs 1 to 111   are incorporated herein by reference.

138.     The Defendants materially breached the terms of the SPSG Acceptable Use Policy which constituted a contract (renewed annually) with the Plaintiffs and/or a contract between the Defendants and the School as to which the Plaintiffs' and their daughter were third party beneficiaries, and engaged in actions which breached the contract's covenant of good faith and fair dealing.

139.     The Plaintiff complied with all requirements of the AUP agreement.

140.     As a proximate result of that breach of contract, the Plaintiff has suffered significant damages as described above.

141.     The Defendants acted with actual malice as described above from an improper motive and to deliberately harm the Plaintiff.

142.     The Plaintiff demands judgment against all Defendants for compensatory damages, interest, punitive damages and the costs of this lawsuit, attorney's fees and all other relief to which Plaintiffs may be legally entitled, in amounts to be determined at trial.

## **PRAYER**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor against the Defendants, awarding equitable relief, including but not limited to an order that SPSG be permanently enjoined and restrained from making false oral or written statements or promises that it provides an environment of "absolute love" or a "supportive sisterhood" and that it "does not tolerate physical or emotional harm" to its students, compensatory damages as well as damages for pain and suffering, costs and punitive damages, along with the attorney's fees and costs incurred in this action, all together with prejudgment and post-judgment interest and such other further relief as the Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

The Plaintiff hereby demands trial by jury.

Respectfully submitted,


   /s/Jamie M. Bennett
Jamie M. Bennett Esq. (08468)
The Bennett Law Firm
8 Creek Side Court
Middle River, MD 21220
443-844-4629
jbennettlawfirm@gmail.com
Attorney for Plaintiff Anne Bennett Fitch